**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CHRISTOPHER S.,
    Plaintiff,                 :            CIVIL CASE NO.
                             :            3:20-CV-00753 (JCH)
v.                           :
                             :
KILOLO KIJAKAZI,        :
COMMISSIONER OF      :
SOCIAL SECURITY,      :            SEPTEMBER 29, 2021
    Defendant.            :

**RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER (DOC. NO. 16) AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (DOC. No. 18)**

**I.     INTRODUCTION**

Plaintiff Christopher S. ("Christopher") brings this action under section 405(g) of title 42 of the United States Code, appealing the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Disability Insurance Benefits under title II of the Social Security Act.  See Compl. (Doc. No. 1).  He moves to reverse the decision of the Commissioner.  Mot. to Reverse the Decision of the Comm'r (Doc. No. 16); Mem. in Supp. of Mot. to Reverse the Decision of the Comm'r ("Pl.'s Mem.") (Doc. No. 16-2).  The Commissioner cross-moves for an order affirming his decision.  Mot. for an Order Affirming the Decision of the Comm'r (Doc. No. 18); Def.'s Mem. in Supp. of His Mot. for an Order Affirming the Comm'r's Decision ("Def.'s Mem.") (Doc. No. 18-2).

For the reasons discussed below, the court vacates the ALJ's decision and remands for further proceedings to develop the record.

1

III.    **BACKGROUND**

A.    <u>Facts</u>

The court adopts the facts as stated in and agreed to in Plaintiff's Joint Statement of Material Facts.   <u>See</u> Pl.'s Statement of Material Facts (Doc. No. 16-1); Def.'s Resp. to Pl.'s Statement of Facts (Doc. No. 18-1).  The facts relevant to the issues the court addresses here are set forth below.

Christopher filed an application for Disability Insurance Benefits on March 10, 2017.[1]  <u>See</u> Admin. Record at 298-301 ("AR") (Doc. No. 14).  Although he alleged an onset date of disability of February 1, 2017, <u>id.</u> at 298, the origins of his medical issues date back well before that.  In 2004, as a "healthy 27 year-old male," he was crossing the street when he was "struck by a car that [was] T-boned" and was "thrown in the air about 20 feet."  <u>Id.</u> at 524, 623, 627-28.  Following the accident, he was taken to Yale New Haven Hospital and "treated in a damage-control fashion," undergoing a "long, complicated course" of therapy.  <u>Id.</u> at 621, 623.  His left tibia-fibula was fractured – an injury complicated by deep venous thrombosis in the same leg – and he was later diagnosed with a distal colon injury, undergoing multiple procedures for his injuries.  <u>Id.</u> at 618.  He remained in-patient at the hospital from April 8, 2004, until May 11, 2004.  <u>Id.</u> at 627.  It was not until over a year later, on June 29, 2005, that he had "healed sufficiently to be allowed to return to full activity in a graded fashion."  <u>Id.</u> at 539.

However, Christopher's recovery did not continue to progress smoothly.  A year later, he was continuing to complain of "knee and ankle aching" that "kep[t] him from

---

[1] Because Christopher's claim was filed before March 27, 2017, the treating physician rule applies. <u>See</u> 20 C.F.R. § 404.1527.

being able to do a lot of different athletics" or "walk outside [for] more than a half hour" without pain.  Id. at 524.  Norman Kaplan, M.D., who first saw him in June of 2006, noted that he was obese and that he thought Christopher "will go on to ankle and knee osteoarthritis at an earlier date than would otherwise be the case."  Id.  Almost three months later, x-rays showed this to be the case.  Id. at 523.  They indicated "some early osteoarthritis at the knee and ankle," and at that point Christopher could not be "on his feet for more than 45 minutes to an hour at a time.  Id.  Dr. Kaplan assessed him to have "a 20% permanent partial disability to [his] lower leg" and a "10% permanent partial disability to the knee."  Id.

Shortly thereafter, Christopher's primary care physician at the time, Paul S. Mikan, M.D., noted some of his other ongoing medical issues.  From a physical standpoint, these included digestive problems and adhesions.  Id. at 535.  Christopher was also "[s]eeing psych for post traumatic syndrome" and was "overwhelmed with stressors."  Id.  Dr. Mikan prescribed him Lorazepam and Lexapro, which helped improve his depression.  Id. at 526, 530, 535.

However, by early 2007, his physical condition had still not improved.  In a February visit to Dr. Kaplan, he reported that he remained unable to "walk for more than a couple of blocks without pain and that he ha[d] trouble standing for more than 30 minutes on concrete without pain."  Id. at 521.  In the mornings, he "ha[d] terrible stiffness . . . especially in the ankle and some in the knee."  Id.  His x-rays showed both early knee and ankle osteoarthritis, and Dr. Kaplan observed that he thought "the ankle is going to be much worse than the knee because [Christopher] definitely has an abnormal tibiotalar joint with significant abnormal angulation in the [anteroposterior]

view so that the ankle is in valgus." Id.  He also speculated that Christopher would likely need surgery and should be in a sedentary job for the rest of his life.  Id.

The record then jumps ahead to 2012.[2]  In August of that year, Christopher underwent an abdominal ultrasound examination, which revealed "gallstones and a fatty liver."  Id. at 398, 409.  He was then referred to William H. Ramsey, M.D., for further testing and evaluation of his liver.  Dr. Ramsey noted that Christopher had been "experienc[ing] intermittent episodes of abdominal pain . . . about twice yearly . . . During [the most recent] episode, he ha[d] severe spasms in his right and left lower quadrants lasting for several hours, associated with an alternating bowel pattern, nausea[,] and vomiting."  Id. at 399.  He ordered further testing, and a liver biopsy performed in early October revealed "steatohepatitis with stage 3-4 (of 4) fibrosis."  Id. at 403.

Around this time, Christopher had embarked on "a serious weight reduction program, complete with a personal trainer and a nutritionist," losing 43 pounds.  Id. at 396.  He was taking Zoloft, Lorazepam, Acidophilus, Vitamin B12, Vitamin E, and fish oil, and that, combined with the weight loss, had led to an overall improvement of his symptoms in the near-term.  Id. at 396-97.  Christopher's health continued to improve over the next year.  He had regained some weight by October 2013, but "much of it [was] muscle weight," and he "continued to work out regularly and ha[d] run several 5K races."  Id. at 394.  Still, in the spring he had another "episode of small bowel obstructive symptoms . . . lasting for 3-4 days [and including] abdominal pain, nausea,

---

[2] The record does include treatment notes from Christopher's visits to Michael S. Barmach, M.D., from 2010 through 2014.  See AR at 631-35, 640-45, 648-49, 660-63, 667-78, 681-706, 709-20. However, these records are handwritten and indecipherable.

and vomiting." Id.  At this point, it appears he was only taking Sertraline for anxiety.  Id.
In March 2015, when he needed medical clearance to lift over 40 pounds for a job
application, his primary care provider Jay R. Humphrey, PA, gave it.  Id. at 447.  In
doing so, he also noted that Christopher had "lifted over 100 lbs historically" and could
"curl over 45 pounds with 1 arm."  Id.

But by 2016, Christopher had again regressed.  In January, he returned to Yale
New Haven Hospital with a fever, abdominal pains, gastroesophageal reflux disease
("GERD"), vomiting, and a "severe" lack of sleep, all in part due to high levels of stress
and anxiety.  Id. at 734.  He followed up with PA Humphrey the next week, who noted
that his "major concern . . . [was] the anxiety."  GERD issues continued to affect his
sleep, for which he was prescribed Protonix.  Id. at 438-39.  He received a CT scan of
his pelvis the next day, revealing "[m]ild right hydronephrosis and hydroureter, with a
small 3 mm stone that ha[d] probably just passed into the urinary bladder . . .
[c]holelithiasis . . . [and] [s]evere, high-grade, mechanical small bowel obstruction, due
to a mid abdominal anterior abdominal wall hernia."  Id. at 411-12.  After a few
additional follow-up appointments, he was referred to Richard S. Stahl, MD, a plastic
surgeon.  Id. at 472-73.  This visit was a "frustrat[ing]" one for Christopher.  Id. at 472.
Despite what Dr. Stahl referred to as an "obvious large, obtrusive hernia formation
occupying most of the territory of his abdomen when he is standing," it was not clear
that a procedure would solve the issue, due to its "difficult nature" and the "high risk of
recurrence."  Id. at 472-73.  Christopher "indicated he may not want to pursue repair if
the results are not more certain," and by May that had not changed.  Id. at 473.

During this period, Christopher also told his doctors how "his work [was] getting tired of him being out all the time."  Id.  This, in part, led to what he described in a May 2016 psychiatric assessment as "unbearable" work stress.  Id. at 551.  "[H]is stress at work increased after his hospitalization in January due to kidney stones and upon returning in January to learn that his project manager had resigned."  Id.  He was put on a 60-day performance improvement plan, began crying at work, and was "sick in bed with anxiety on weekends."  Id.  He was recommended for "[w]eekly individual psychotherapy focusing on learning and implementing adaptive coping skills," and "expressed a willingness to learn and implement" these skills.  Id. at 552-53.  He saw PA Humphrey the next day and was prescribed Ativan for his increased panic attacks.  Id. at 430, 432.  Although the medication worked initially, id. at 427-29, the continued deterioration of his situation at work led to him "throwing up, completely on egg shells" when he was there.  Id. at 423.  PA Humphrey prescribed him Zofran for his nausea, but by mid-June 2016 Christopher had quit his job.  Id. at 425, 461.  With his work stress gone, he began to "feel[ ] so much better."  Id. at 461.  The physical manifestations of his anxiety were also reduced.  Id.

Beginning on May 22, 2016, Christopher saw Mark J. Ostrowski, Psy.D., for psychotherapy.  Id. at 549.  He was diagnosed with "Adjustment Disorder with mixed anxiety and depressed mood," but his "experience of anxiety ha[d] diminished significantly" since he had left his job.  Id. at 549-50.  "Since then," Dr. Ostrowski observed, "with the exception of a few intermittent episodes of panic, he has been struggling mostly with occasional feelings of boredom, and isolation."  Id. at 550.  During that period, Dr. Ostrowski's treatment notes indicate that Christopher was keeping busy

in part by trying to "resum[e] regular exercise, at least three times per week," and hunting and kayaking.  Id. at 557, 559.

Christopher alleges a disability onset date of February 1, 2017, in the midst of his sessions with Dr. Ostrowski.  Id. at 298.  After that date, he continued to note gastrointestinal issues related to anxiety and "significant physical distress."  Id. at 909. His visits to PA Humphrey, his primary care provider, reflect this as well.  Id. at 780.  On July 6, 2017, he saw Myron Brand, M.D., for the first time at Connecticut Gastroenterology Consultants due to "abnormal liver functions."  Id. at 784.  After his initial visit, Dr. Brand noted that he wanted to move slowly with Christopher due to his anxiety, but given his clear "past history of steatohepatitis with advanced fibrosis" would proceed with several tests related to his liver.  Id. at 784-85.

The first of these tests was done on July 12, and consisted of a "markedly limited" ultrasound.  Id. at 499.  The physician observed that Christopher's "liver [was] very echogenic . . . [and] most likely represents hepatic steatosis." Id. On August 10, 2017, Dr. Brand noted that his "most recent liver functions, if anything, look worse," and that he would continue to run more tests.  Id. at 494-95.  Dr. Brand's "working diagnosis" at this point "continue[d] to be nonalcoholic fatty liver disease given his past history of [non-alcoholic steatohepatitis]" (NASH).  Id. at 494.  However, on August 15, he wrote a letter to Christopher saying that his "most recent liver functions [were] much improved . . . They are not normal, but they are now in range, which is fully compatible with steatohepatitis."  Id. at 493.  A month later, Christopher received a FibroScan, which was "consistent with an F3-F4 fibrosis."  Id. at 491.  At this point, he was "believed to have steatohepatitis in a relatively advanced stage," and there was "little doubt that [his]

7

steatohepatitis has caused a pre-cirrhotic state." Id. Dr. Brand did note that

Christopher was "feeling well," and that he was in some respects improved since he

stopped taking NSAIDs. Id. Still, Dr. Brand ordered more tests and was clear that he

"assume[d] that [Christopher] has relatively advanced liver disease somewhere between

F3-F4 fibrosis." Id.

Christopher continued to follow up with PA Humphrey and Dr. Ostrowski over the

course of the next ten months, and on June 7, 2018, again saw Dr. Brand. Id. at 561-

62. In addition to his liver issues, Dr. Brand noted his "chronic" and "severe" abdominal

pain, due to "very large incision hernias as a consequence of his multiple surgeries due

to his automobile accident." Id. at 561. These medical issues, in Dr. Brand's opinion,

had "clearly affected his lifestyle" to the point where Christopher was "clearly [ ] unable

to work." Id. Dr. Brand advised Christopher to go to a pain clinic so that he could stop

using NSAIDs, namely ibuprofen, which in his circumstances could "lead to further

hepatic injury, as well as to renal dysfunction." Id. at 561-62.

A week later, Christopher also went to physical therapy for the first time. In his

initial examination, it was noted that he had mid-low back pain and significant limitations

in his lumbar active range of motion. Id. at 804-05. However, his rehab potential was

listed as "good." Id. at 805. He continued to progress with physical therapy over the

next few months, and by the end of June was able to go fishing in a kayak, although his

back was "very painful" when he was done. Id. at 814. During his next session in early

July, Christopher stated that his "back [was] starting to feel better," and that he was

"happy" with the progress. Id. at 816. Two sessions later, however, his back was again

"stiff" due to increased stress. Id. at 820. Still, Christopher was making progress during

the physical therapy sessions, with "[i]ncreased dynamic core endurance exercise [of] 17 min[utes] on the [treadmill] with incline and 3 [pound weights] in hand," and continued improvement in his thoracolumbar mobility. Id. at 822, 824. After missing almost a month of therapy though, Christopher's digestive issues had translated to increased back pain, and he showed "decreased functional endurance" compared to previous sessions. Id. at 826. As he continued to attend therapy sessions consistently again, his "back continue[d] to improve." Id. at 834. He last saw the physical therapist on September 7, 2018, and was assessed to have achieved between 30% and 55% of his treatment goals. Id. at 834.

B.   Consultative Examination and Medical Source Statements

The record also consists of a consultative examination performed at the request of the State Agency, along with three medical source statements – two from Dr. Ostrowski and one from Dr. Brand.

On May 17, 2017, Christopher underwent a consultative examination by Adedotun Adebamiro, M.D. Id. at 477-85. This exam took place prior to Christopher seeing Dr. Brand or undergoing the extensive tests on his liver. Christopher presented to Dr. Adebamiro with a "chief complaint" of "complex recurrent obtrusive hernias, adhesive disease and [small bowel obstruction], status post colon perforation and resection, nonalcoholic fatty liver disease, adjustment disorder, detachment disorder, depression, [and] anxiety." Id. at 478. His "[g]ait [was] wide based and normal strided," and he was "able to sit without assistance and rise to a standing position without assistance." Id. at 481. His motor and range of motion examinations were assessed to be unremarkable, with the exception of his diminished lumbar spine range of motion. Id. at 481-83. After making these observations, and noting that Christopher was able to

9

"dress and undress" without assistance, Dr. Adebamiro concluded that he could "walk or stand [four] hours in an [eight] hour work day with adequate breaks and rest periods," and lift or carry 30 pounds occasionally and 20 pounds frequently.  Id. at 484.

Dr. Ostrowski prepared two medical statements, the first on February 13, 2017, and the second on May 22, 2017.  In the first, after seeing Christopher for approximately nine months, he noted how "Christopher's experience of anxiety ha[d] diminished significantly since leaving work.  Since then, with the exception of a few intermittent episodes of panic, he has been struggling mostly with occasional feelings of boredom, and isolation."  Id. at 550.  The second opinion consisted of Dr. Ostrowski's responses to a state-agency evaluation form.  Id. at 486-490.  Again, he noted that Christopher's "[a]nxiety ha[d] diminished significantly since leaving his job," although "he continue[d] to have intermittent anxiety."  Id. at 486.  He also noted that Christopher frequently had a problem, or had limited ability, interacting with others and getting along with others without distracting them or exhibiting behavioral extremes.  Id. at 489.  As to Christopher's task performance, Dr. Ostrowski declined to answer that part of the questionnaire, saying that he had "not had the opportunity to observe the patient's task performance."  Id.

Finally, Dr. Brand provided the final medical source statement on October 22, 2018.  Id. at 928-33.  However, his responses were limited, and he left many questions unanswered.  At the top of the form, he was explicit about his lack of capacity to address all the issues raised in the form.  "I filled this out the best I could," he wrote, but it would be "best to have his primary MD fill these forms out."  Id. at 928.  Still, Dr. Brand went on to complete the form as best he could.  He stated diagnoses as non-alcoholic

steatohepatitis, incisional hernias, and gallstones, and the prognosis as "guarded" given the "risk of cirrhosis." Id. Dr. Brand also noted that Christopher's depression and anxiety had physical manifestations in the form of nausea and abdominal pain. Id. at 929. Importantly, Dr. Brand opined that both Christopher's pain and stress were severe enough to "constantly" interfere with the "attention and concentration needed to perform simple work tasks." Id. at 930. He also stated that Christopher could not walk one city block without rest or severe pain, or walk one block on rough or uneven terrain or climb steps without the use of a handrail at a reasonable pace at all. Id. He needed to lie down for about three hours in an eight-hour workday, and could stand for less than one hour per workday. Id. at 930-31. Dr. Brand also commented that Christopher could not even lift or carry five pounds in a competitive work environment, and that he would likely be unable to complete an average workday more than five times per month. Id. at 932-33. He concluded by stating that in his opinion, given Christopher's limitations, he was "unable to obtain and retain work in a competitive work environment." Id. at 933.

     C.    <u>Procedural History</u>

Christopher submitted his application for Disability Insurance Benefits on March 10, 2017, alleging disability since February 1, 2017. Id. at 298-301. In a notice dated June 22, 2017, his application was denied. Id. at 155. After filing a request for reconsideration on August 15, 2017, id. at 165, his claim was again denied on September 22, 2017. Id. at 167-69. On October 31, 2017, Christopher requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 175-76.

On January 3, 2019, the hearing was held before the ALJ. Id. at 47-118. Christopher was represented by an attorney, and he and a vocational expert both testified. Id. at 48-49. Christopher's testimony portrayed his medical issues as getting

progressively worse over time.  "[T]hings have been getting worse for approximately two years now.  And the age of 40 hit me like a brick wall . . . I've been working to overcome my accident since 2004 . . . . For a time, life was okay.  But life has just been progressively worse and worse and worse."  Id. at 53, 79.  In particular, Christopher pointed to the fact that his liver condition "typically does not get better," as well as his continued gastrointestinal issues and their effect on his life.  Id. at 53.  "Everything affects it," he said.  Id. at 60.  "My mental health, my physical health.  It's like . . . a vicious cycle."  Id.

Christopher testified that his "sitting and standing time is greatly affected . . . My endurance is greatly affected overall and not just the sitting and standing but the ability to properly cognitively function on the job."  Id. at 62-63.  For example, the previous Sunday night he had "some major digestive issues" and possibly "a partial obstruction."  Id. at 63.  This led to him "intermittently throwing up" throughout the night, which lead to him "not getting any sleep" and to "even more pain."  Id.  He was unable to eat when he had episodes like this, which occurred at least twice a month and generally lasted about three days.  Id. at 64.  In sum, Christopher stated that he "can't even eat properly . . . I can't sleep.  And I can't digest."  Id. at 63.  "Stamina is the biggest issue . . . My ability to cognitively function is greatly reduced because, wow, combating this phenomenon I get irritated, I get impatient, I get agitated, I have a quick temper . . . I'm so weak from not being able – not even the illness itself, but not even being able to eat properly."  Id. at 70-71.

All this, combined with his back problems, meant that sometimes Christopher believed he could not even cook on his feet for 15 minutes, though on average he

thought he was capable of standing for 15-30 minutes at a time.  Id. at 66.  After eating, he would need to sit "for a minimum of an hour and a half" with "intermittent[ ]" standing to reduce the pain.  Id. at 67.  Although he believed he could lift 20 pounds with both hands, there was "[n]o way" he could carry around even 15 pounds for five minutes out of an hour consistently.  Id. at 78.

Still, on March 12, 2019, the ALJ issued his Decision finding that Christopher was not disabled for the purposes of the Social Security Act.  Id. at 25-45.  In step one of his analysis, he determined that Christopher had not engaged in substantial gainful activity since February 1, 2017.  Id. at 31.  In step two, he found that Christopher had three severe impairments, in particular hernias, depressive disorder, and anxiety disorder.  Id. Next, in step three, the ALJ concluded that Christopher did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1 to subpart P of part 404 of title 20 of the Code of Federal Regulations.  Id. at 32.

In step four, the ALJ determined Christopher's residual functional capacity ("RFC").  After considering the entire record before him, the ALJ concluded that Christopher had the RFC "to perform light work . . . with further limitation to simple work that is not time sensitive in nature and does not demand intense sustained focus; to not being able to do work with the public; to work that can be done independently with little need for collaboration of coworkers and only occasional interaction with supervisors; and to not being able to do work that involves frequent changes in work routine."  Id. at 34.  Finally, the ALJ determined at step five that Christopher could not perform his past relevant work, but that there were "jobs that exist in significant numbers in the national

economy that [he could] perform." Id. at 37.  Specifically, he relied on the vocational

expert's testimony at the hearing to conclude that Christopher could "perform the

requirements of representative occupations such as a Hand Bander with 12,000 jobs

available nationally or collator operator with 11,000 jobs available nationally." Id. at 38.

In his opinion, the ALJ also considered each of the medical opinions in the record

and assigned them evidentiary weight.  He gave little weight to Dr. Brand's medical

source statement, assessing that the "extreme level of limits" it claimed were not

supported by "objective findings" in the record.  Id. at 36.  Similarly, he gave no weight

to Dr. Brand's earlier statement in the record that Christopher was clearly unable to

work, as such a determination was reserved for the Commissioner and Dr. Brand's

treatment notes were inconsistent with such a conclusion.[3] Id.  The ALJ then gave

some weight to the impairment questionnaire filled out by Dr. Ostrowski, though noted

that its value was reduced because it did not "specifically address the claimant's mental

[RFC]." Id.  He also gave little weight to Dr. Adebamiro's opinion, as it was "based on a

one-time consultation." Id.  Finally, he afforded "significant weight" to the assessments

made by the State agency medical doctor and psychologist, who had not seen

Christopher in person, as they were "not inconsistent with the medical treatment notes"

in the record.  Id at 37.

Christopher requested review of the ALJ's decision on April 23, 2019.  Id. at 296.

Almost a year later, the Appeals Council denied his request, making the ALJ's March

---

[3] He also gave little weight to Dr. Kaplan's 2007 statement that Christopher should be in a
sedentary job for the rest of his life, as it was "made approximately 10 years prior to the claimant's alleged
onset date," and Christopher had actually done "subsequent work activity at the light exertional level." Id.

12, 2019 decision the final decision of the Commissioner.  Id. at 1-4.  On May 29, 2020,

Christopher filed a Complaint before this court.

## IV.   STANDARD OF REVIEW

The ALJ follows a five-step evaluation to determine whether a claimant is

disabled within the meaning of the Social Security Act.  At the first step, the

Commissioner considers whether the claimant is currently engaged in substantial

gainful activity.  If not, the Commissioner proceeds to the second step and considers

whether the claimant has a "severe impairment" which limits his or her mental or

physical ability to do basic work activities.  If the claimant has a "severe impairment," the

Commissioner proceeds to step three and asks whether, based solely on the medical

evidence, the claimant has an impairment listed in Appendix 1 of the

regulations.  See 20 C.F.R. § 416.920(a)(4).  If the claimant has one of these

enumerated impairments, the Commissioner will automatically consider that claimant

disabled, without considering vocational factors such as age, education, and work

experience.  Id.

If the impairment is not "listed" in the Regulations, the Commissioner proceeds to

step four and asks whether, despite the claimant's severe impairment, he or she has the

RFC to perform past work.  At step five, the Commissioner determines whether there is

other work the claimant could perform.  Id.  To be considered disabled, an individual's

impairment must be "of such severity that he is not only unable to do his previous work

but cannot . . . engage in any other kind of substantial gainful work which exists in the

national economy."  42 U.S.C. § 423(d)(2)(A).  The Commissioner bears the burden of

proof on the fifth step, while the claimant has the burden on the first four steps.  See

McIntyre v. Colvin 758 F.3d 146, 150 (2d Cir. 2014).

The court's review of the Commissioner's decision "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation omitted); see 42 U.S.C. § 405(g). "Substantial evidence" requires "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  When considering mental illnesses, "[c]ycles of improvement and debilitating symptoms . . . are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and treat them as a basis for concluding a claimant is capable of working." Estrella v. Berryhill, 925 F.3d 90, 97 (2d Cir. 2019) (citations and internal quotations omitted); see also Stacey v. Comm'r of Soc. Sec. Admin., 799 F. App'x. 7, *10 (2d Cir. 2020) ("[Plaintiff] occasionally being in a good mood does not undermine the conclusion that he is severely limited in social interactions.").

## V.   DISCUSSION

### A.   Development of the Record

Christopher first argues that the ALJ failed to adequately develop the record. Pl.'s Mem. at 4-9.  He also argues that the ALJ erred in his Step Two analysis, failed to properly apply the treating physician rule, and made findings at Step Five unsupported by the record. Id. at 1-4, 9-22.

The court begins with the issue of whether the ALJ adequately developed the record.  An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately. See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). Whether the ALJ has satisfied this duty to develop the record is a threshold question.

16

Before determining whether the Commissioner's final decision is supported by substantial evidence under section 405(g) of title 42, "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." Scott v. Astrue, No. 09-CV-3999, 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (internal quotations omitted). The obligation to develop the record "exists even when . . . the claimant is represented by counsel." Delgado v. Berryhill, No. 3:17-CV-54, 2018 WL 1316198, at *6 (D. Conn. Mar. 14, 2018) (quoting Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)) (internal quotations omitted). "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." Delgado, 2018 WL 1316198 at *6 (internal quotations and citations omitted).

Christopher argues that the ALJ failed to adequately develop the record in two ways: first, by failing to solicit an updated medical source statement from Dr. Ostrowski, and second by neglecting to secure any opinion at all from PA Humphrey, Christopher's primary care provider. Pl.'s Mem. at 4-5. The Commissioner counters by arguing that any need for these two opinions was obviated by the extensive medical evidence already in the record, including several medical opinions by Dr. Brand, Dr. Ostrowski, and other consultative physicians. Def.'s Mem. at 19-22. Below, the court addresses each of Christopher's arguments in turn.

1. Dr. Ostrowski

As an initial matter, "[t]he Second Circuit has held that it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." Delgado, 2018 WL 1316198 at *8 (internal quotations

17

and citations omitted).  "[A] medical source statement is not necessarily required to fully develop the record where 'the record contains sufficient evidence from which an ALJ can assess the [claimant's RFC].'"  Crespo v. Comm'r of Soc. Sec., No. 18-CV-435, 2019 WL 4686763, at *3 (D. Conn. Sept. 25, 2019) (quoting Tankisi v. Comm'r of Soc. Sec., 521 F. App'x. 29, 34 (2d Cir. 2013)).  According to the Second Circuit, the "sufficient evidence" standard evidence is at least met when the medical records are "extensive," "voluminous," and include "an assessment of [the claimant's] limitations from a treating physician."  Tankisi, 521 F. App'x. at 34.  In interpreting Tankisi, another Judge in this District has found that, "[i]n essence, [it] dictates that remand for failure to develop the record is situational and depends on the circumstances of the particular case, the comprehensiveness of the administrative record, and . . . whether an ALJ could reach an informed decision based on the record.  Holt v. Colvin, No. 16-CV-1971, 2018 WL 1293095, at *7 (D. Conn Mar. 13, 2018) (internal quotations and citations omitted).  Thus, in determining whether it was necessary for the ALJ to solicit an updated medical source statement from Dr. Ostrowski, the court must evaluate the record as a whole and assess whether it was possible for the ALJ to reach an informed decision based on the record absent an updated opinion from Dr. Ostrowski.

The court concludes that it was.  First, unlike in Tankisi and Guillen v. Berryhill, 697 F. App'x 107 (2d Cir. 2017), this is not a case where there were no medical source statements in the record from the claimant's treating physician.  When it came to assessing Christopher's anxiety and mental health, there were two – both from Dr. Ostrowski, his "primary mental health treatment provider from May of 2016 through [ ] May of 2018."  Pl.'s Mem. at 4.  Of course, the mere presence of multiple medical

source statements is not dispositive, especially when, as Christopher points out, the most recent one was signed in May 2017, more than a year and a half before the hearing with the ALJ.  See, e.g., Angelica M. v. Saul, No. 3:20-CV-00727, 2021 WL 2947679, at *8-9 (D. Conn. July 14, 2021) (remanding for failure to develop the record when multiple medical source statements related to the claimant's mental health were in the record, but they were out of date or incomplete and failed to fill significant gaps in the record related to her ability to function in the workplace).  The fact that Dr. Ostrowski's opinions were outdated, Christopher argues, meant that the ALJ was obligated to secure an updated opinion in advance of the hearing.

However, this argument misunderstands Tankisi and Guillen.  In Tankisi, the Second Circuit held that, "although [the record did] not include an assessment of [the claimant's] RFC from her treating physician . . . it [did] include an assessment of [his] limitations from a treating physician."  Tankisi, 521 F. App'x at 34.  This, coupled with the "voluminous medical records" available to the ALJ in the case, were "adequate to permit an informed finding by the ALJ."  Id.  Because such an "informed finding" was possible, it was "inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing [the claimant's RFC]."  Id.  In contrast, the Guillen court found that the assessments of the claimant's limitations necessary to make an informed decision about the claimant's RFC were not present in the record before the ALJ.  In that case, the court explicitly distinguished Tankisi by noting that, in contrast to the record before the ALJ there, "the medical records obtained by the ALJ" – which did not include a medical source statement from the claimant's treating physician – "[did] not shed any light on [her RFC]."  Guillen, 697 F. App'x at 108.

Christopher relies, inter alia, on Guillen to argue that remand is necessary because "it is impossible to know from [Dr. Ostrowski's] contemporaneous chart notes what [he] believes [Christopher] can or cannot do on a function-by-function basis based on the seventeen treatment sessions" they had together after the most recent medical source statement in the record.[4]  Pl.'s Mem. at 7.  This argument is belied by the extensive and detailed chart notes in the record from Dr. Ostrowski detailing each of these sessions.  AR at 903-09.  In his May 2017 medical source statement, Dr. Ostrowski noted that Christopher had "anxiety and panic attacks in the context of his previous job" but that his "anxiety has diminished since leaving [that] job."  Id. at 486.  While Christopher "continue[d] to have intermittent anxiety," Dr. Ostrowski opined that he did not believe "a higher level of care [was] indicated at [the] time."  Id.  He went on to rate Christopher's functional abilities in the Activities of Daily Living and Social Interactions categories, but declined to do so for Task Performance because he had "not had the opportunity to observe the patient's task performance."  Id. at 488-89.

Dr. Ostrowski's treatment notes from the 20 sessions following this opinion are remarkably consistent with these observations.  He documents Christopher's constant struggle to manage his bouts of anxiety and frustration with his current life circumstances, but also discusses Christopher's use of coping strategies to deal with these stressors.  Id. at 903-09.  Dr. Ostrowski's notes do not reflect any major changes since the May 2017 medical source statement and, taken together, lend further support for the conclusions in that opinion: that Christopher "continue[d] to have intermittent

---

[4] Although Christopher states there were 17 additional treatment sessions from the date of Dr. Ostrowski's second medical source statement on May 22, 2017, through May 11, 2018, there appear to be 19 in the record, as well as a twentieth that took place on May 18, 2018. See AR at 903-09.

anxiety," but that his level of his anxiety had "diminished since leaving his job" and did not necessitate a higher level of care at the time.  Id. at 486; see also Cepeda v. Comm'r of Soc. Sec., No. 19-CV-4936, 2020 WL 6895256, at *10 (S.D.N.Y. Nov. 24, 2020) ("[f]or a medical opinion to be stale, not only must there be a significant period of time between the date of the opinion and the hearing date, there also must be subsequent treatment notes indicat[ing] a claimant's condition has deteriorated over that period") (internal quotations and citations omitted).

In circumstances like these, where the record relating to Christopher's anxiety and mental health is "quite extensive" and "adequate to permit an informed finding by the ALJ . . . it would be inappropriate to remand on the ground that the ALJ failed to request [an updated] medical opinion[ ]" from Dr. Ostrowski.  Tankisi, 521 F. App'x at 34.  Dr. Ostrowski's decision to not respond to the questions about Christopher's task performance in his May 2017 medical source statement does not change this conclusion.  There is nothing in Dr. Ostrowski's detailed treatment notes about his subsequent sessions with Christopher indicating that he had the opportunity to observe Christopher's task performance after his May 2017 opinion.  And, in contrast to Guillen, where "the medical records obtained by the ALJ [did] not shed any light" on the claimant's RFC, the medical records related to Christopher's anxiety and mental health here contain two medical source statements from Dr. Ostrowski, as well as comprehensive treatment notes from each of the 20 sessions Dr. Ostrowski had with Christopher after the date of those medical source statements that are consistent with the opinions he set forth in them.  Guillen, 697 F. App'x at 108.

Accordingly, because "there are no obvious gaps in the administrative record" related to Christopher's anxiety and mental health, and "the ALJ already possesses a complete medical history" of his sessions with Dr. Ostrowski, remand for failure to secure an updated medical source statement from Dr. Ostrowski is not warranted. Rosa v. Callahan, 168 F.3d at 79 n.5.

2.    PA Humphrey

Christopher also argues that the ALJ failed to develop the record by neglecting to obtain a medical source statement from PA Humphrey.  This argument proceeds in two parts.  First, Christopher contends that, because PA Humphrey was his "primary care clinician from March of 2015 [ ] to May of 2018," the ALJ should have sought an opinion from him "detailing on a function-by-function basis what [Christopher] can or cannot do." Pl.'s Mem. at 4.  Second, he argues that an opinion from PA Humphrey was especially necessary in light of the explicit statement from Dr. Brand – the only treating physician for Christopher's physical ailments with a medical source statement in the record – that his primary care provider should have been the one filling out the forms.  Id. at 5.

On this issue, the court agrees with Christopher.  As a preliminary matter, the court notes that the ALJ would not have been required to give any medical opinion from PA Humphrey, as a Physician Assistant, controlling weight under the treating physician rule.  This is because, while "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the same is not true for a PA who is the claimant's primary care provider.  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotations and citations omitted) (emphasis

22

added); see, e.g. Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) (the opinions of a PA "do not demand the same deference as those of a treating physician"); SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006) (listing PAs as "medical sources who are 'other sources'" that may "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function," but whose opinions may not be entitled to controlling weight) (rescinded as of Mar. 27, 2017).  However, because PA Humphrey did "treat [Christopher] on a regular basis, [his] opinion is entitled to some extra consideration," even if it may not be afforded controlling weight.  Mongeur v. Heckler, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983). "[T]he ALJ ha[s] 'discretion to determine the appropriate weight to accord [a PA's] opinion based on all the evidence before him.'" Ruff v. Saul, No. 3:19-CV-01515, 2020 WL 6193892, at *8 (D. Conn Oct. 22, 2020) (quoting Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995)).

Even subject to such discretionary review, a PA's opinion can be crucial to fill important gaps and adequately develop the record.  This is especially true when – as is the case here – the sole medical source statement from a treating physician in the record relating to the claimant's physical ailments says that the primary care provider would be better suited than him to answer the questionnaire, and that primary care provider is a PA.  See, e.g., SSR 06-03P, 2006 WL 2329939, at *4 (noting that the regulations "require consideration of . . . evidence (including opinions) from 'other sources' [such as PAs] . . . when evaluating an 'acceptable medical source's' opinion"). In his medical source statement, Dr. Brand explicitly acknowledges the limitations in his ability to assess Christopher's functional capacity, stating that he "filled [the questionnaire] out the best [that he] could" based on "the few times [he had] seen

[Christopher]."  AR at 928.  Given his more limited knowledge of Christopher's capacities, he goes on to leave several questions in the assessment completely blank, several of which are critical for filling gaps in the record.  Finding that Dr. Brand's conclusions about Christopher's physical limitations were "not supported by the medical evidence in the record," the ALJ assigned "little weight" to his October 2018 opinion.  Id. at 36.

This is problematic for two reasons.  First, "[w]here the record contains a treating source opinion, but the opinion is incomplete, unclear, or inconsistent, the Second Circuit has held that the ALJ's duty to develop the record requires the ALJ to seek additional information."  Delgado, 2018 WL 1316198 at *11 (citing Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) and collecting cases); see also Selian, 708 F.3d at 421 (holding that, because the opinion of the treating physician was "remarkably vague," and the ALJ had to rely on "sheer speculation" to interpret its meaning, the ALJ, "[a]t a minimum . . . likely should have contacted [the physician] and sought clarification of his report"); Angelica M., 2021 WL 2947679 at *9 (remanding for failure to develop the record because, inter alia, one of the medical source statements was incomplete and missing several pages and "the ALJ should have solicited an updated opinion").

Second, "'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'"  Delgado, 2018 WL 1316198 at *11 (quoting Rosa, 168 F.3d at 79); see also Zurek v. Colvin, No. 6:15-CV-0453, 2016 WL 4466791, at *7 (N.D.N.Y. Aug. 24, 2016) (citing Rosa to hold that "[a]n ALJ is not required to seek additional information absent 'obvious gaps' in the

administrative record that preclude an informed decision," but "additional evidence or clarification is sought when . . . the medical reports lack necessary information").

Taken together, these principles dictate that the ALJ should have solicited a medical opinion from PA Humphrey.  Dr. Brand declined to fill out key portions of the questionnaire and explicitly stated that Christopher's primary care provider would be better positioned to provide responses.  In other words, not only was his medical source statement incomplete, it also acknowledged its own limitations and provided clear instructions on how to rectify those deficiencies.  Moreover, absent a medical opinion from PA Humphrey, there remain significant gaps in the record related to Christopher's limitations.

Because such gaps remain, the failure to develop the record by not securing such an opinion from PA Humphrey was not harmless error.  For instance, the ALJ concluded that Christopher's testimony in the hearing regarding his chronic pain, stamina, and strength was "not entirely consistent with the medical evidence and other evidence in the record."  AR at 34.  But when it comes to pain management, the record leaves obvious gaps as to the level of Christopher's pain and his ability to work in spite of it.  For example, Dr. Brand noted in a letter to PA Humphrey in June 2018 that, because Christopher's "pain [was] severe" and he was "using [such] a great deal of ibuprofen" that it could be harmful to his health, he had "advised him to go to a pain clinic."  Id. at 561-62.  However, the record is silent as to whether Christopher heeded this advice, or how he moved forward with treating his chronic pain after that visit.  An informed medical opinion from PA Humphrey, to whom Dr. Brand had sent that letter, could have helped fill this gap.

25

Similarly, Christopher testified at the hearing that his digestive and back problems "greatly affected" his "ability to sit and stand," and that, after he eats he needs to sit down "for a minimum of an hour and a half" while standing intermittently.  Id. at 62, 67.  Yet the severity of these issues and how they would impact his ability to work were precisely the questions Dr. Brand declined to answer in his medical source statement, instead deferring to PA Humphrey.  Id. at 928, 931.  Further development of the record in the form of a medical source statement from PA Humphrey is necessary to address questions like these.  Unlike Christopher's anxiety and mental health records, where there are near-complete medical source statements in the record along with detailed treatment notes documenting individual sessions, these gaps in Dr. Brand's opinion – and the record related to Christopher's physical limitations as a whole – means that "clarification from [PA Humphrey is] necessary to assist the ALJ in determining whether or not [Christopher] is disabled."  Isernia v. Colvin, No. 14-CV-2582, 2015 WL 5567113, at *12 (E.D.N.Y. Sept. 22, 2015).

For these reasons, remand to develop the record is warranted here.  On remand, the ALJ should seek a medical source statement from PA Humphrey.  Because the record was not fully developed, the court does not reach the other issues raised by Christopher or assess whether the ALJ's findings were supported by substantial evidence.  Cordova v. Saul, No. 3:19-CV-0628, 2020 WL 4435184, at *5 (D. Conn Aug. 3, 2020) ("[w]here, as here, an ALJ fails to adequately develop the record in reaching a conclusion on a claimant's [RFC], the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence") (internal quotations and citations omitted).

**VI.     CONCLUSION**

For the reasons stated above, the court vacates the ALJ's decision and remands for further proceedings, thereby denying the Commissioner's Motion for an Order Affirming the Decision of the Commission (Doc. No. 18) and granting in part and denying in part Christopher's Motion to Reverse the Decision of the Commissioner (Doc. No. 16), insofar as his Motion seeks an order reversing the ALJ's decision.

The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the undersigned.

**SO ORDERED.**

Dated at New Haven, Connecticut this 29th day of September 2021.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge